**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **TRACI TAMIKO ETO,** | ) |
| | ) **Civil Action No:._____** |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **Jury Trial Demanded** |
| | ) |
| **MAYO CLINIC,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiff **Traci Tamiko Eto** brings this civil action for relief and damages against Defendant **Mayo Clinic,** based on the following factual allegations and causes of action.

## NATURE OF THE ACTION

1.      This action to correct unlawful employment practices by Mayo Clinic arises under the retaliation provision of the False Claims Act, 31 U.S.C.A. § 3730(h)(1), the Americans with Disabilities Act ("ADA"), § 42 U.S.C.A. § 12112, and the retaliation provision of the Family and Medical Leave Act, 26 U.S.C.A, § 2615 (a)(2).

2.      This lawsuit is a narrative of institutional wrongdoing at one of the most venerated healthcare institutions in the world: the Mayo Clinic. The alleged misconduct involves the most simultaneously dangerous and exciting sector of innovation in the 21st Century economy: the boom in artificial intelligence (AI").

3.      The plaintiff, Traci Tamiko Eto ("Eto"), has established herself as a nationally recognized expert in the development of ethical and regulatory compliance

1

standards for AI. When she joined the Mayo Clinic in December 2023 as Director of Research Operations, she was designated as the leader of Mayo's efforts to align with the Biden Administration's October 2023 Executive Order establishing security and privacy-based safeguards for the burgeoning AI sector.

4.      Over the next 18 months, Eto would uncover a disturbing set of flaws in Mayo's AI compass. It started with gaps in the protection of patient privacy; exemptions from institutional review protocols regarding privacy were exploited much too freely.

5.      Eto observed other fundamental lapses that included manipulation of data to conceal unfavorable outcomes, deployment of a software tool without proper oversight, and in one instance, the authorization of a cardiac surgical procedure without adequate institutional review; and a propensity for evading the federally mandated institutional review process.

6.      When Eto pushed back, her standing at Mayo became a casualty. She was systematically excluded from projects that she had spearheaded, and from operational planning sessions; her supervisory authority was diminished; and by the spring of 2025, she was warned that she had been targeted for termination.

7.      In the spring of 2025, within weeks of receiving a salary adjustment and written praise for stellar contributions, Eto was placed on a performance improvement plan; not for performance errors, but on the cryptically phrased grounds that she was a poor cultural fit.

8.      Eto's fortunes at Mayo would further unravel. After a return from medical leave in September 2025, Eto was abruptly informed that her position had been eliminated

2

in a restructuring in which she was in fact the sole target. Although promised an opportunity to apply for other internal roles, Eto was passed over for 15 applications, securing a grand total of one interview: an inconceivable outcome for a contributor of her talent and experience.

9. Eto's effort to align Mayo's practices of institutional oversight with best practices implicate the federal False Claims Act and the Supreme Court's standard that a federal grantee that runs afoul of its certification to follow federal law is liable under the Act. Consequently, her opposition to Mayo's lapses constitutes protected activity under the Act.

10. Mayo's elimination of Eto's job while on medical leave, and its resistance to that leave in the first place, further triggers liability under the ADA and the FMLA.

11. Eto seeks economic damages of back pay and front pay; compensatory damages for emotional distress and mental anguish under the False Claims Act and the AD, in addition to punitive damages under both statutes for the willful violation of her statutory rights; as well as her attorneys' fees and costs of litigation.

## THE PARTIES

12. Plaintiff Eto at all times relevant to this complaint was employed remotely by Mayo.

13. Mayo Clinic is a global leader in medical treatment in complex medical treatment and research and is headquartered in Rochester, Minnesota.

3

**PERSONAL JURISDICTION**

14.    Mayo is subject to service at the address of its registered agent Sally Ann Brown, at 200 1st St. SW, Rochester, MN, 55905.

**SUBJECT-MATTER JURISDICTION AND VENUE**

15.    Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

16.    Venue is proper in this district and division under 28 U.S.C.A. §1391(b)(1)-(2), as Defendant resides in and conducts business in this district and division and the acts or omissions giving rise to the claim occurred in the same venue.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17.    Eto filed an uncounseled charge of ADA discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on February 22, 2026.

18.    Eto subsequently received a right-to-sue letter from the EEOC on April 7, 2026 and timely asserts her ADA claims.

**FACTUAL ALLEGATIONS**

19.    Eto has accumulated 18 years of experience regarding the protection of human subjects of scientific research: a field that encompasses compliance with industry and federal regulatory standards; technological risk assessment; and guidelines for the sharing of research data.

20.    In 2015, Eto began developing a specialty in the governance of AI scientific research. She initially served as a clinical research coordinator on Stanford's Institutional Review Board ("IRB"), a federally mandated independent entity that monitors compliance

with federal and ethical standards for human subject research. She was named the manager of the Human Research Protection Program of the IRB at the Stanford Research Institute International.

21.     Eto transitioned to the healthcare sector, serving as Manager of Research Compliance for Kaiser Permanente and Associate Director of the Office of Research Integrity and Compliance at Chicago's Lurie Children's Hospital.

22.     In December 2023, Eto was hired to lead as Director of Research Operations at Mayo, which meant that she would support the clinic's Human Research Protection Program and its IRB, and oversee a team of 36 employees and three managers.  Eto's ascension came at a time when the Biden Administration had just issued in October 2023 the first Presidential Executive Order outlining governance standards for AI for federal entities or contractors.

23.     Mayo is a financial behemoth, collecting roughly 21.5 billion dollars in revenue in 2025. Its approximate 1 billion dollars of research funding is composed of roughly 498.million dollars of federal and state government funding and upon Eto's information and belief, roughly 12% of the human subject research that is AI sourced derives from federal grant funds, principally the National Institutes for Health.

24.     Each federal grant Mayo receives is accompanied by a requirement that the Clinic certify its compliance with relevant federal standards, which include human subject protections, protection of patient privacy, and the integrity of the IRB process that each research grantee is required to maintain. A failure to comply with the web of relevant federal standards would justify any grant for which the entity asserts compliance.

25.     In the late spring or early summer of 2024, Eto first raised concerns about the Mayo Clinic Platform ("MCP"), which is a vehicle for merging data regarding patient treatment with advanced clinical research. MCP stores reams of patient information that must in turn be de-identified to secure patient privacy.

26.     Eto detected signs that certain de-identification processes within MCP, specifically those related to data-sharing with global providers, had not been properly reviewed by Mayo's IRB process. While there are highly specific categories of exemption for IRB review that apply to de-identification, none of the relevant factors appeared to Eto to be applicable.

27.     Eto raised the de-identification issues to her principal supervisor, Jeffrey Schmoll, the Administrator of Research Shared Services, who had oversight of the IRB process, and Scott Wright, the Senior Chair and Medical Director of the IRB and Human Research Protection Program.

28.     Wright was resistant to Eto's alarms. Without in any way challenging the substance of her concerns, Wright insisted that having the de-identification process revisited by the IRB would jeopardize the pace of ongoing research projects, which in turn would compromise Mayo's competitive advantage.

29.     The exchange over de-identification would only be a precursor. From the summer of 2024 to the spring of 2025, Eto would have occasion to observe a series of ongoing ruptures in Mayo's compliance culture.

30.     One problem area involved Wright's repeated efforts to substitute his own personal review of IRB submitted research projects without providing the specific

justifications for bypass of full IRB review outlined in federal regulatory standards including 21 CFR. 56.109. On repeated occasions, Wright either removed the primary reviewer or discarded the primary reviewer's input.

31.    Another involved a directive from Jeffrey Schmoll to expedite changes to the Investigator Brochure without obtaining full IRB review. Schmoll's instructions also adhere to the bypass standards contained in 21 CFR. 56.109.

32.    On another occasion, Wright deliberately manipulated the assignment of a particular protocol review to a specific IRB panel on the grounds that the leadership of the panel would be particularly compliant. That kind of deliberate steering of outcomes conflicts with 45 CFR. 46.107(3), which mandates that IRB processes are free from coercion or efforts to influence outcomes.

33.    Yet another incident involved pressure from Wright and Schmoll on Eto's staff to approve informed consent waivers for particular AI research projects, or in some cases to forgo documentation of informed consent waivers, actions that breach 45 C.F.R. 46.116(d) and 21 CFR.

34.    In July 2024, Wright overruled Eto's objections and provided a letter authorizing approval of a high-risk investigational medical device to perform cardiac surgery although the procedure had never obtained IRB review and the procedure was not licensed for use in a foreign country.

35.    In November 2024, Eto flagged an especially flagrant breach involving a research study of the Mayo digital assistant tool, MAYA. Eto reported that the MAYA study team mischaracterized a series of outcomes, deleted unfavorable results, and

7

compounding the injury, deployed an unsanctioned software device, SaMD, without obtaining regulatory authorization to do so. The use of SaMD in the study compromised both safety and data security because it injected the software into ordinary clinical workflow with which MAYA was interacting.

36. The MAYA project was deeply flawed to the point of corruption and Eto was by no means the only dissenting voice: 10 separate whistleblower reports sounded similar alarms that study investigators were attempting to disguise a 67% error rate. Yet, Wright and Schmoll directed approval of the study and exempted it from IRB inspection.

37. When Eto pressed Schmoll for an explanation, his excuse was that resolution of the issue would cost "political capital" that he was not prepared to spend—an evasion of responsibility that stunned Eto.

38. At another point in early 2025, Schmoll instructed Eto's team to approve the sale of patient biospecimens to a commercial entity without IRB review, much less approval.

39. In the same early 2025 time-frame, Eto's team uncovered a data privacy lapse involving an NIH funded study. The project sought to distribute patients' genome sequencing data into a widely accessible database although the original consent forms did not consent to such data sharing.

40. The genome sequencing incident was a reprise of an episode approximately 14 months earlier involving another NIH study, in which Eto intervened to stop a Mayo researcher from misusing a HIPAA exemption to circumvent informed consent rules.

8

41. As detailed, Schmoll himself actively floated protocols, sometimes acting in conjunction with Wright. He admonished Eto in late 2024 that Eto was damaging her status by challenging Wright's efforts to circumvent the very oversight system that he chaired. His phrase was that Wright had "Commander's intent" and should not be pressed to document or substantiate his effort to end-around IRB review.

42. It is unclear what "Commander's intent" means beyond a loose interpretation of "Do as you are told." The concept is emphatically not an exemption operating in any part of the federal register.

43. In February 2025, Eto lodged an internal report with the legal department regarding the two most clearcut examples of misconduct: the significant irregularities in the MAYA study and Wright's intervention to sanction the cardiac surgery procedure that IRB had never sanctioned.

44. Within days of Wright and Schmoll being briefed on Eto's written allegations, she immediately began to be excluded from executive level meetings of the human research operations leadership team, and her principal subordinate, Michelle Daiss, was inserted into the meetings in her place. An administrative staffer confided to Eto that she had been instructed to stop including Eto in meetings with Wright on the grounds that he no longer wished to interact with her.

45. An AI engineering director warned Eto in early March that Schmoll had said that Wright was infuriated by Eto's report to the legal team and had issued "marching orders….to get rid of Tamiko ASAP."

9

46.   On March 12, 2025, Schmoll proceeded with an apparently already approved plan to award Eto a $7,000 pay raise to approximately $166,000. But the letter announcing the raise was somewhat perfunctory in tone, merely thanking Eto for being a "valuable partner" without noting the range of innovations Eto had championed during her 15 months at Mayo: they include no less than 12 automation initiatives and appropriate streamlining of the IRB review process and an AI Protocol builder that Eto invented (and continues to employ).

47.   On March 28, 2025, Schmoll abruptly confronted Eto with a blunt warning that there were two paths in front of her at Mayo: (1) resign as Research Director with Schmoll's "blessing" and an explicit promise that he would support her efforts to obtain some other well-compensated role at Mayo; (2) but if Eto declined to resign, she was facing the prospect of consequences in her "personnel file" that would render her unemployable at Mayo and would impede her career outside the institution.

48.   At this point, Schmoll did not—and could not—describe any specific performance flaws or missteps in Eto's work. The best he could offer was a vague euphemism that she had proved to be a poor "cultural fit" for her department.

49.   Schmoll's threat to Eto in late March 2025 was a not even veiled threat that her annual evaluation process, which was underway, would be used as an active weapon against her and he would follow suit.

50.   On April 23, 2025, Schmoll presented Eto with a formal corrective action plan that recycled events that were in some cases over a year old and had never previously been a subject of correction. The areas of improvement were cursorily described. And the

plan was littered with supposed feedback from stakeholders of the department who were in fact criticizing the inevitably slow pace of complying with internal and federal regulation, not Eto's actions in their own right.

51.     It is significant that Schmoll seems to have altogether ignored the input of 12 internal peers that Eto provided as part of Mayo's 360 evaluation protocols. The corrective action did not document or address any of their feedback.

52.     In addition, Schmoll directed Eto to stop conducting one-on-one meetings with her direct reports, a tool that limited her capacity to perform the supervisory part of her role.

53.     Eto formally challenged the performance plan with the human resources ("HR") department, alleging that she had faced reprisals for reporting compliance concerns.  There is no indication that the HR team conducted any meaningful investigation and it eventually issued a perfunctory finding that the corrective action did not violate Mayo policies.

54.     Eto would in effect be sidelined over the next several months, excluded altogether from Director level engagement or participation in leadership level meetings.

55.     Eto's health would also deteriorate in the aftermath of the performance plan. She increasingly experienced what were diagnosed as symptoms of distress and chronic anxiety.

56.     In early July 2025, Eto was informed that she would no longer manage her team and her status was essentially downgraded to an individual contributor's role. In addition, Eto was removed from participation in several projects that she had conceived

11

and received inventor credit, including the AI Protocol Builder and another project called the Innovation Guide.

57. Eto suffered a significant depressive episode immediately after her de facto demotion. But despite ample medical documentation of her condition, the leave department initially rejected her application for FMLA leave.

58. In mid-July 2025, an HR staffer advised Eto that her FMLA leave application was being reviewed by higher management officials at Mayo–a complete departure from the ordinary leave approval process and an admission that confidential details regarding her mental health were being disseminated to management figures who had no legitimate involvement in the leave process.

59. Only after Eto retained an attorney who served Mayo with correspondence threatening legal action did the clinic authorize her placement on leave effective July 31, 2025 with a projected end date of October 22, 2025.

60. On September 2, 2025, roughly halfway through her leave, Eto was notified that her position was being eliminated as part of a supposed reduction in force. In fact, her job was the sole one eliminated.

61. The notice advised Eto that she could apply for internal positions at Mayo within a 90-day window, until December 1, 2025. In that interval, Eto's leadership took no evident steps to assist her transfer and if anything, they impeded her efforts. Even after her return from work, her email response remained set to an out-of-office message, which understandably may have raised concerns about Eto's readiness to return to work.

12

62. Eto would go on to apply for 15 jobs, yet received a single interview despite an impeccable academic and professional background and national expertise in the most rapidly surging area in healthcare innovation.

63. On December 1, 2025, Eto was officially terminated.

64. Since her departure from Mayo, Eto's career prospects have been moribund, with no viable prospects. The reasons may be attributable to another internal tool that Mayo exploits. Company sources have advised Eto that the clinic utilizes a "ghost file" system that blacklists employees who have raised compliance concerns by flagging them as "Not Eligible for Rehire" in external verification systems to which a former employee would not have access.

65. The collapse of Eto's career is a casualty of her protected activity in favor of adhering to federal and institutional standards regarding AI governance and the IRB process—precisely the role that Eto was hired to perform

66. In addition, the deterioration in her emotional and mental health supplied her leadership team another rationale for exiting her from the organization in violation of both the ADA and the FMLA.

67. Schmoll inflicted one more meaningful retaliatory injury upon Eto. Near the conclusion of her FMLA leave, Schmoll instructed the Mayo Clinic Patent Office to exclude Eto from participating in the original patent filing for the AI Protocol Builder that she designed, on the faulty premise that her FMLA status might preclude her participation in future inventor meetings.

68.    While Eto is listed on the patent, her inventor interest is substantially understated; therefore, Scholl's maneuvering has had the effect of diminishing her financial interest in a lucrative commercial asset.

## CAUSES OF ACTION

## COUNT I

### (Retaliation under the False Claims Act, 31 U.S.CA. § 3730(h)(1))

69.    Plaintiff Eto incorporates by reference the factual allegations of this complaint as though set forth fully and separately herein.

70.    Plaintiff engaged in protected activity under the False Claims Act, in that she made efforts to stop one or more violations of the Act, specifically, repeated deviations from the federally mandated institutional process for human research processes.

71.    Plaintiff's protected activity under the Act was a but-for cause of adverse actions including substantial reductions in the scope of her job responsibilities, reduction of her financial interest in a commercial asset she designed, the elimination of her position, and her eventual termination.

72.    As a result of the Mayo Clinic's unlawful retaliatory conduct, Plaintiff has suffered monetary damages, including but not limited to back pay; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

14

## COUNT II

### (Discrimination in violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12112(A))

73.    Plaintiff Eto incorporates by reference the factual allegations of this complaint as though set forth fully and separately herein.

74.    Plaintiff was a disabled individual within the meaning of the ADA, in that she suffered from a mental health impairment but was able to perform the essential functions of her job.

75.    Plaintiff's disability was a but-for cause of adverse actions including reduction in her financial interest in a commercial asset she designed, the elimination of her position, and her eventual termination.

76.    As a result of the discriminatory conduct by the Mayo Clinic under the ADA, Plaintiff has suffered monetary damages, including but not limited to the value of lost back pay, front pay, and bonuses; loss of economic opportunity and future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT III

### (Retaliation in violation of the Family and Medical Leave Act, 29 U.S.C.A. § 2615(a)(2))

77.    Plaintiff Eto incorporates by reference the factual allegations of this complaint as though set forth fully and separately herein.

78.    Plaintiff engaged in protected activity under the FMLA in that she took leave for a serious medical condition.

79.     Plaintiff's exercise of her right to take FMLA leave was a but-for cause of a reduction in her financial interest in a commercial asset she designed, and the elimination of her position.

80.     As a result of the retaliatory conduct by the Mayo Clinic under the FMLA, Plaintiff has suffered monetary damages, including but not limited to the value of lost back pay, front pay, and bonuses; as well as loss of economic opportunity and future benefits.

## COUNT IV

### (Interference in violation of the Family and Medical Leave Act, 29 U.S.C.A. § 2615(a)(1))

81.     Plaintiff Eto incorporates by reference the factual allegations of this complaint as though set forth fully and separately herein.

82.     Plaintiff exercised her rights under the FMLA in that she took leave for a serious medical condition.

83.     The Mayo Clinic interfered with Plaintiff's exercise of her FMLA rights by eliminating her position while she was on protected medical leave, and by taking actions that reduced her financial interest in a commercial asset she designed, therefore making her usage of FMLA leave a negative factor in subsequent adverse employment actions.

84.     As a result of the Mayo Clinic's interference under the FMLA, Plaintiff has suffered monetary damages, including but not limited to the value of lost back pay, front pay, and bonuses; as well as loss of economic opportunity and future benefits.

## **PRAYER FOR RELIEF**

Wherefore, based on the above-stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits.

B. Compensatory damages under the ADA and the False Claims Act to the extent allowed by law.

C. Punitive damages under the ADA and False Claims Act based on Defendant's engagement in discriminatory practice with malice or reckless indifference to Plaintiff's federal protected rights.

D. Attorneys' fees and costs of litigation.

E. Pre-judgment and post-judgment interest at the highest lawful rate.

F. Such other equitable and monetary relief as the court deems just and proper.

G. A declaratory judgment that Defendant's actions violated Plaintiff's statutory rights and that Defendant shall refrain from future unlawful discriminatory conduct in its employment practices.

Respectfully submitted the 6th day of July, 2026.

**HKM EMPLOYMENT ATTORNEYS LLP**

*s/ Emma R. Denny*
Emma R. Denny, #395334
Drew Kudlinski, #505091
305 5th Ave N, Suite 440
Minneapolis, MN 55401
Telephone: (612) 643-9306
Facsimile: (612) 643-9306
edenny@hkm.com
dkudlinski@hkm.com

Artur Davis[1]
Alabama Bar No. 3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Telephone: 205-881-0935
adavis@hkm.com

Rebecca Rojas[2]
California Bar No. 272662
3600 Lime St. Building 2, Suite 114
Riverside, CA 92501
Telephone: 951-269-4229
rrojas@hkm.com

**Attorneys for Plaintiff Tamiko Eto**

---

[1] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Mr. Davis is licensed in the state of Alabama and the District of Columbia.

[2] Rebecca Rojas will promptly file for admission *pro hac vice* as an attorney of record in this action. Ms. Rojas is licensed in the state of California.